Andrew M. Wyatt, counsel for the appellant, your nominee, N. Ray Wilkins, Leslie Howard Aylward, counsel for Appalachian Laws, and Leslie H. Aylward, M.D.C., and Judge Taylor, Mr. Nielsen. All right. Thank you. All right. Mr. Wyatt, do you wish to reserve time?       All right. All right. All right. All right. All right. All right. All right. All right. Mr. Wyatt, do you wish to reserve five minutes, Your Honor? All right. Thank you. You may begin. Good morning, Your Honors. May it please the Court. My name is Andrew Wyatt, and I represent the appellant, and I know I only have ten minutes, so I am not going to rehash my brief because I think I was pretty thorough in it. But I would like to open up to the Court to answer any questions or any ambiguities that my brief may have caused for the Court to have clarification. You know, I think that the briefing on this was pretty straightforward and linear. I personally do not have any specific questions. I do not. But do you wish to just, given that we don't have, again, we agree that it's a fairly straightforward issue and we don't have questions, why don't you get your main point? Well, Your Honor, Your Honors, I've had to deal with a client that basically had her whole world come down on her. She started this case as a Chapter 13 to preserve. She had a family home, and it is our position that the Court was misled in terms of her concealing assets, and it is briefed that with a claim of over $500,000 in concealed and after all the attorney fees to get that, it really was not a big score. But that's Monday morning quarterbacking. I mean, the trustee's job is to liquidate assets of the estate, isn't it? That's true, Your Honor. That is true. However, in this case, my client provided a declaration from her accountant indicating that what was being relied on, and again, this was actually being initiated by the attorney for the Schreiber Trust. So it wasn't actually the trustee. This was actually an attorney who was bringing this up. And he indicated, the accountant, that some of what he was, the attorney was relying on was old information that wasn't correct. And my client went through frustration trying to prove to the Court that she was not being dishonest. That being said, we're here today because it was converted to a Chapter 7. And that issue really isn't in front of us. No, it isn't, Your Honor. I'm just giving the Court some background just to understand where she's coming from. And the house was valued at almost a million dollars. And our position is, Your Honor, is that the attorneys involved, there was no incentive to settle this case because they knew that the house, and it was free and clear. So they knew there was a million dollars sitting there. And as I indicated in my briefing, I made numerous attempts to try and minimize attorney fees, try and preserve the estate from my client. And there was no incentive on the other side to do so. And so at the end of the day, Mr. Avery got over $200,000. But isn't part of that because of the number of events that transpired in the bankruptcy? I mean, weren't there numerous appeals in this bankruptcy, like four of them? No. No, there was only one appeal, and it was an action never heard because of a deadline being missed. That was the last time we were here. But no, there were some hearings because, again, my client was being treated as a hostile, as a malingerer. And so everything was being generated. And quite frankly, and I hate taking this kind of position, but it appeared like because they knew there was a pot of gold at the end of the rainbow, there was no reason not to bring all these motions. Let me take you back to a point and ask a different question because I understand your theory. Your theory is they turned the case. That's, to use a colloquialism. And one point of evidence you have is you say, look, in collecting this personal property or these allegedly omitted assets, they spent more than they collected. And you also agreed with me that the issue of whether or not your client's actions justified putting the receiver in place is not in front of us, so we have to assume that her actions did. And what part of, in the history of this case, isn't there a place for integrity of the system? You know, I mean, we don't simply do an analysis of dollars in, dollars out, and if they don't net, say, well, you don't get your attorney's fees. Judge Spraker raised one good issue, which is the rearview mirror issue, that, you know, sometimes we spend money and we can't penalize a lawyer for not having the sufficient foresight to know that there was going to be a problem. But isn't this an integrity of the system case, at least for purposes of our analysis here today? It is partially that, Your Honor, yes. It is because, in my opinion, based on my investigation, I don't think that Judge Klein did a thorough enough review of the billings of what went through because, again, I think that if this case was worth a lot less, we'd be looking at a very different case. And the fact that they basically knew that there was going to be money, there's nothing to stop filing motion after motion and collecting fees, as you say, turning the case. But doesn't there have to be some opposition to really turn it to $200,000? Well, there was opposition. Well, that's the problem. If it was such a slam-dunk case, why didn't the debtor just give the assets, liquidate it, and be done? I mean, part of their response is going to be, well, we had to fight with the debtor. I understand that's their argument, Your Honor. Part of it, as I breathe, is that a lot of the functions of the trustee were actually being done by the trustee's attorney. And I point that out. For example, in the sale of the house, the attorney was managing all that, had someone fly up there to make sure that my client was out of the house. That was the eviction process. Yeah. So a lot of the functions, when I was reviewing the billings, really were functions that Mr. Menchaca should have been doing and should have been covered by his fee. And so if you look at it, a lot of what Mr. Avery billed was not legal. It was more administrative stuff. So the question is, Judge Klein went through the billing statement line by line and eliminated several specific items that you thought were either duplicated or not necessary or overbilled. And did you raise the question with her at the trial court that the conduct that Mr. Avery was engaging in was, and did she consider the argument and reject it as, after her review of the billing statement, she found it to be reasonable? I did raise it, Your Honor. It really fell on deaf ears. And I think you would have to be there to see it. And with no disrespect to Judge Klein, she's a fine jurist. However, for whatever reason, she did not like my client and was very clear in all rulings. The way she was handling it, she, again, considered her a liar, a cheat, and none of that was true. And she didn't get treated as well. So the fact that they were coming with these billings, in my estimation, it was a rubber stamp. Even though I know that there were two small, small, I think it reduced it by a few hundred dollars, Your Honor, a token change, but really, substantially not. And then with Mr. Uris, it was the same thing, where he was not only getting paid by the trust and recovered his fees for the trust, but he was generating all this extra work by having adversary actions and things like that. And, again, at the end of the day, I understand that you have to marshal the assets, but the value of the assets were closer to my client's estimate than they were to theirs. My client estimated it at about $10,000. It came in, I believe, at $24,000, but they spent a lot of money to get it with paying for an auction. And they were billing it as hundreds of thousands of dollars of assets, and it was not worth anything close to it. And I think – Well, they were billing for other stuff, too, including denial of your debtor's discharge. I'm sorry, say that again. I mean, they were doing other stuff, too, including denying your debtor's discharge, which wasn't going to return a monetary – Right, but part of it, too, was that because when they sold the assets, all of the creditors are going to get paid out of the sale of the house. We don't dispute that part of it. I mean, that part was legitimate. It was the feasting on it by the attorney fees and the trustee fees. That's what we're arguing about, not that all the creditors got paid. But, again, if you look – and I know it's not for this court, but the history of the way this thing morphed into the case it was, it was a very, very simple case. It was a case that when you look at the kind of fees that are generated, it's shocking to the conscience that you can generate $200,000 of billing. So I see that my time is up. Thank you for your attention. All right, we'll let you reserve the rest of your time. Thank you. All right. Mr. Avery. May it please the Court. I understand we have three experienced bankruptcy judges on this panel. I wonder how many cases you've seen like this. I bet you've seen some. But here are the highlights. Counsel says there was only one appeal. There were five appeals. How many times have you had to see a trustee sell a house twice? How many times have you – And you had to sell it twice because of interference. Right, and the debtor told the court she'll move out. And I relied on that. And I have used billing judgment because I didn't pull the trigger then. She said she's moving out. I took her at her word. Instead, we had the appeal of five orders at once which went up to this bet, none of them timely. That caused mass confusion in the case. The fact that she wouldn't move out, I didn't know where we were at that point. So we started treading water with the 727. Eventually, we were able to get those appeals dismissed. Eventually, we found another buyer. But she still wouldn't move out, so we had to have the marshals come up. And is that why your assistant or the person went down to monitor the eviction? The big problem here is that the sale was in another district. That's the problem. So we were using brokers who had no familiarity with the bankruptcy process, none. The trustee is an accountant. He is not an attorney. We've got a combative debtor. We've got a naked brother in the backyard causing all kinds. This is a problem. That's a problem. This is a problem, okay? And it has to be dealt with. The paralegal I sent is very experienced at evictions, and I think she had three or four under her belt. I used billing judgment. I didn't go. Okay? So I used billing judgment there. I was not running the meter. What's extraordinary in this case is it's a surplus case. They're still complaining. A surplus of $23,000. All claims were paid. Counsel said that the house was free. No, that's not true. There was a lien against the house, which was paid from the Shriver Trust. Counsel said that the court didn't look at the objections below. Of course they did. She went through every single objection. Counsel said that he raised the issue of trustee work being done by an attorney in the court below. He did not. How do you respond to that? I challenged him in my appellee's brief on that, and in his reply brief he was silent. He didn't point to a single place in the record. Well, he does point to the eviction. That's the one. No, but there's. And sending your paralegal down to monitor it as the trustee should have been the representative of the estate monitoring it. I think that would be frightening for a trustee. Would it make a difference if the trustee was a lawyer? I think it might have, yeah. It might have, but he wasn't. In our district, I don't know, I'm not familiar with your districts, we have a rule 2016-2F2. Do you have such a rule? I don't know. You have rules for everything in this district. Now, the chances are no, but go ahead and tell us what it is. Okay, so appellants should have had an analysis under 2016-2F2. There was no analysis. I mean, that lists in our district what has to be done by a trustee and can be done by an attorney. I even challenged him in my appellee's brief. Reply brief is silent on it. Other than that, I guess I'm open for questions. But the local rule, to the extent he's correct, that it's trustee versus attorney, we don't have a rule, we just have a practice that we watch what trustees do. But the rule can't, your local rules can't change substantive law or other rules and procedures. So I think it's helpful to you as a practitioner. I'm not sure it's binding on us as a panel if we were to go there, but I'm not sure we need to. So the only other question I had was about the year attendance at the 341 meeting. Okay. In my district, those are typically run by trustees and counsel for the trustee doesn't attend the 341 meeting. He had 13 separate hearings, and I think you attended either all or most of them. I think I attended two. In our, well, the Russell Evidence Manual, Barry Russell's Evidence Manual, has mixed case law on whether or not 341A testimony can be introduced as evidence. The point is I saved money there by skipping a deposition. I was always trying to save money, every single time. And you had identified this as a possible case for 727 before you started attending the 341As? What was the impetus for, let me ask it as a question rather than an observation. What was the impetus for your attendance at the 341A meeting as a factual matter as opposed to a, you know, what made you think you were going to need a deposition? Because the schedules didn't make sense. And I would bet this panel has never seen a case in your careers where the accuracy of debtor's schedules was challenged. And the debtor never changes them. She never changed them. She amended them and gave us the same figures again. She just dug her heels in. You always do that, especially when you're faced with a 727. You always amend the schedules, every single time. And then you say to the judge, oops, we made a mistake. Now the judge has got to figure out whether to hold the debtor's debt or not. Never happened here. But the point is you had closed with an insured value of $21,000. She put down a value of $1,500. She amended it to $1,500. She had collectibles with an insured value of $167,000. She scheduled that as having a value of zero. And then she amended it to $1,000. She had jewelry, which she insured at $35,000. She scheduled it at $500 and amended it at $500. She had household goods that she scheduled at $5,000, which doesn't appear to have been insured. We sold that eventually for $24,187, but the problem was it was in a storage facility, and they were asserting a warehouseman's lien. Every part of this case was hard. Every part was tough. But I saw this as a chance to take cheap discovery, and I did so through the 341A. I made the observation earlier that one of the things that potentially we could look at and that the bankruptcy judge definitely could look at is work done to protect the integrity of the system. Was that in the trustee's view at this time, and was that an impetus for actions that you took? Yes. Okay. And how? By denying her discharge for fraud, for not keeping accurate records, for failing to explain the loss of assets. I mean, the findings were very broad. She was a bad actor. The funny thing is, at the beginning of the case, I warned her. I warned her. I said, if this is a surplus case, we're going to be litigating on your nickel right from the start. But she just dug her heels in, and that's it. Anything further? No, Your Honors. Thank you. Thank you. Thank you. All right, Mr. Wyatt, you have 4 minutes and 56 seconds. Thank you, Your Honor. Okay, just a few things I want to address. Oh, yes, in terms of the eviction. This argument that you have to be a lawyer to watch if someone's moving out of a house. I mean, you could hire someone probably at $10 an hour to report back. I don't think the argument was to watch. I think it was to be involved, if necessary, given the prior history. Okay, but what I addressed in my brief, Your Honor, was that he sent this assistant up to the Bay Area to observe. And that's where I think it was a trustee's duty, either personally or to have someone he would designate as part of his fees to do it. I think the tougher question is, why was Judge Klein wrong to find that as between those two interpretations of the situation, why is it error? You know, I can't give you a really good answer because I came in very late into the case, and this was one of the arguments I was going to bring up in terms of what counsel was saying, is that part of it is, and I don't know if the court will accept this or not, but I'm going to say it anyway, is that she was a victim of the system. And I say that because she had several attorneys representing her, and she's had attorneys go out of the case at critical times where things were due and things like that. There were times that she was improper, and she was trying to do the best she can. And I'll be very honest, because I have personal experience with this, is that Mr. Avery is not the easiest guy to get along with, okay? He would be very obstinate at times. And one of the arguments I brought up in terms of the whole attorney fee issue was that on numerous occasions, I actually used his billings to show you the conversations that I had with him about attempting to settle the case. He was saying, well, why didn't you just turn in the assets or whatever? We were trying to do that. We were trying to cooperate. We were trying to preserve the estate for her. If you're going to sell off her house, first off, one thing was not mentioned, is that she had elderly parents living in that house. And that's why she fought against having it go, because that was their home. Her mother ended up passing away just before it was sold, and the father was moved out of the house. So that's her emotional reason for trying to hang on to the house. But one thing I do, I mean, I've been a practicing attorney for 26 years, and we settle cases. We settle cases because it's in the best interest of everybody, including the system. And I've talked to him, and at one point he said, I'm going to limit my fees to $100,000 if you take it. And then ever since then, all I did was attempt to get a hold of him. What about it? What about it? What about it? There were emails. There were phone calls. And again, as this pot of gold was coming about, because the house did sell for $986,000, there was no incentive. Why take $100,000 when you can have $205,000? And with all respect to Mr. Avery, but I found that he was not very open, not very cooperative. And when I brought it up in the hearing for the attorney fees, I brought that same issue up, and I said to the judge about the $100,000. He said, well, she wouldn't have gone through with it anyway, so why bother? That was his response to it. And I do stand corrected. I did forget that the Schreiber Trust had a mortgage on the property. I think that's really all I have. Are there any more questions I can answer for the court? No. Thank you. Thank you for your good argument. Thank you. The matter will be deemed submitted. Thank you. Thank you. All right. You may call the next matter.
judges: Taylor, Spraker, Gan